UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Juan Garcia,

    *Petitioner,*

v.

Tom Dart,

    *Respondent.*

No. 22 CV 1958

Judge Lindsay C. Jenkins

MEMORANDUM OPINION AND ORDER

Juan Garcia, an inmate at the Cook County Jail, brings a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his convictions for first-degree murder and first-degree attempted murder. [Dkt. 1, 8.] For the following reasons, the petition is denied.

## I.    Background

### A.    Conviction and Underlying Facts

A jury convicted Garcia and his co-defendant Justin Chapman of one count of first-degree murder for the death of Anna Mateo, 720 ILCS 5/9-1(a)(1), and one count of attempted first-degree murder of Randy Edmondson, 720 ILCS 5/8-4, 9-1(a)(l). *See People v. Garcia* ("*Garcia I*"), No. 1-07-0265 (Ill. App. Ct. Jan. 13, 2009), Dkt. 19-1. The facts underlying Garcia's conviction, drawn from the state appellate court's order denying Garcia's appeal following his 2006 trial, are as follows.[1]

---

[1]    In habeas proceedings, federal courts presume that state courts' factual findings are correct, 28 U.S.C. § 2254(e)(1); *see Winfield v. Dorethy*, 956 F.3d 442, 452 (7th Cir. 2020), and neither party challenges that presumption here. The Court adopts the factual account provided in *Garcia I* and *People v. Garcia* ("*Garcia II*"), 2021 WL 2290801 (Ill. App. Ct. May 28, 2021), Dkt. 19-7.

Late in the evening on August 19, 2003, Anna Mateo and her mother Maria Mateo were outside their home at 18th Place and Leavitt Avenue in Chicago, when Maria heard a sound like firecrackers. She turned to find her daughter lying on the sidewalk, unconscious and bleeding from her head. Anna was transported to a hospital, where she later died. *Garcia II*, 2021 WL 2290801, at *1.

Nearby, Randy Edmondson was visiting his friend, Lori Rincon, who lived on the corner of 18th Place and Leavitt, near the Mateos' home. Shortly after midnight, a car carrying three men pulled up in front of Rincon's house. According to Rincon, the men in the car threw up gang signs and spoke to Edmondson. The person in the front passenger seat, whom Rincon later identified as Garcia, exited the car. She described Garcia as short, Hispanic, and approximately 14 or 15 years old. Rincon heard the driver of the car tell Garcia to "buck at him," which she understood to mean shoot Edmondson. According to Rincon, Garcia pulled a gun from his pants and ran toward Edmondson, firing three shots in his direction. Rincon called the police. *Id.* In connection with the police's investigation, Rincon viewed two lineups and a photo array, but did not identify anyone. Then, on March 3, 2004, she identified Garcia as the shooter in a photo array. Two days later, Rincon identified Garcia from a physical lineup. Rincon also identified Garcia as the shooter at trial. *Id.*

At trial, Edmondson testified that, on the night of the shooting, he was talking to Rincon outsider her house when a car approached with three Hispanic men inside. Edmondson described the person in the front passenger seat as short with a shaved head and a chubby face. He identified Garcia as the shooter. Edmondson testified

that Garcia asked him if he was a member of the Satan Disciples and Edmondson responded that he was not. The driver looked at Garcia and said, "Get him," prompting Garcia to pull out a gun. Garcia chased Edmondson as he ran across the street, shooting in Edmondson's direction eight or nine times. Edmondson stopped running when he saw Garcia running back toward the car. *Id.* In December 2003, prior to the trial, Edmondson was shown a photo array and he identified someone who "looked like" the shooter. On March 4, 2004, Edmondson identified Garcia as the shooter in a photo array and, the next day, identified Garcia in a lineup. *Id.* at *2.

Adrian Covarrubias testified at trial about the events of August 19, 2003. According to Covarrubias, he and Justin Chapman went to Jose Arteaga's apartment near 18th Street and Loomis, a place known as "the Pit." Covarrubias and Chapman were both members of the Latin Counts street gang, and the Pit was a Latin Counts gathering spot. Covarrubias testified that Garcia—whom he did not know well but had seen around—was at Arteaga's apartment that night. Covarrubias said that he, Chapman, and Garcia decided to leave Arteaga's apartment together around midnight. Chapman drove, Garcia sat in the front passenger seat, and Covarrubias sat in the back seat. Chapman stopped the car at a house near 18th Place and Leavitt, where a man and woman were standing outside. Garcia threw up the Satan Disciples symbol to lure the man closer. As the man approached, Garcia exited the car and started chasing him, shooting five or ten times as he did. Garcia got back in the car and the group returned to Arteaga's home. On cross-examination, Covarrubias was

questioned about the possibility that Sammy Govea, who would have been 20 years old in 2003, might have been the shooter. *Id.*

During the defense phase of the trial, Garcia's mother, Diane Garcia, testified that Garcia was 16 years old at the time of the shooting and that Garcia had three brothers: Hector, Fabian, and Nicholas. According to Diane, during the week of the shooting, her father, Victor Martinico, and his wife, Coralia, were in Chicago to attend several family gatherings. Earlier in the day on August 19, 2003, Diane and Nicholas went to a mall from about 7:00 to 9:20 p.m., and later the family had dinner together at her apartment on the 2400 block of South Pulaski. Diane testified that Garcia was home all day and that sometime after 9:30 p.m., Garcia, Fabian, and Nicholas went to their shared bedroom to play video games. Diane and her father watched television until about 11:20 p.m., after which her father and his wife said goodbye to the brothers and left for their hotel. Diane testified she went to sleep in the front room of the apartment around 11:45 p.m. because she did not have a bedroom of her own. Diane testified that she did not observe Garcia leave the apartment at any time. The next day, she and Garcia drove her father and his wife to the airport. On cross-examination, Diane testified that in 2003, Garcia was about 5′2″ tall and had a close-shaven haircut. *Id.* at *3.

Garcia testified on his own behalf, corroborating his mother's testimony that he was at her house at the time of the shooting. He testified that his grandfather and his grandfather's wife were in Chicago to attend family events. The day of the shooting, Garcia spent all day visiting with them at the apartment he shared with

his mother. Garcia denied being a member of any street gang, but he acknowledged that his older brother Hector was a member of the Latin Counts. According to Garcia, he did not know Arteaga personally, but he knew him to be one of Hector's friends and who lived near the Pit. Garcia denied ever having been to the Pit and denied having been involved in the shooting. He testified that he did not know Covarrubias or Chapman personally but had seen them around. *Id.*

During a discussion outside the presence of the jury, defense counsel noted that Garcia's grandfather was present in the courthouse, but that the defense had decided not to call him as a witness. *Id.* Following closing arguments, the jury found Garcia guilty of first-degree murder and attempted first-degree murder, and the trial court sentenced him to consecutive prison terms of 50 years and 6 years.[2] *Id.* On direct appeal, the state appellate court affirmed Garcia's conviction. *Garcia II*, 2021 WL 2290801 at *4. Garcia's petition for leave to appeal before the Illinois Supreme Court was denied. *People v. Garcia*, 910 N.E.2d 1129 (Ill. 2009) (table), Dkt. 19-5 at 2.

### B. Postconviction Proceedings

Garcia filed a petition for state postconviction relief, claiming that his trial counsel provided ineffective assistance under *Strickland v. Washington*, 466 U.S. 668 (1984), by failing to call several witnesses at trial. *People v. Garcia*, 2013 WL 6035963, at *1 (Ill. App. Ct. Nov. 12, 2013), Dkt. 19-6. The trial court dismissed the petition without a hearing, but the state appellate court reversed and ordered the trial court to hold an evidentiary hearing. *Id.*

---

[2] On March 5, 2020, the trial court vacated Garcia's sentence, and he is awaiting resentencing. [Dkt. 1 at 5.]

### 1.    Hearing Testimony

In addition to Garcia, the defense called five witnesses: Jose Arteaga; Garcia's mother, Diane; Garcia's grandfather's wife, Coralia Martinico; and two of Garcia's brothers, Fabian and Nicholas. Garcia's grandfather, Victor Martinico, had passed away in 2015. The State called Garcia's trial counsel, Eric Mitchell, as a witness. *Garcia II*, 2021 WL 2290801, at *5. The testimony from the hearing was as follows.

**Jose Arteaga**: Arteaga testified that he lived at 1606 South Loomis, near the Pit; that he came to know Garcia through the Latin Counts; but that Garcia was not at his home on the night on the shooting. Arteaga testified that he met Garcia's lawyer, Mitchell, at a restaurant prior to the trial. Arteaga told Mitchell that Garcia was not at his house on the night of the shooting, and Mitchell told him to come to court because he would be called as a witness. According to Arteaga, when he arrived, Mitchell "approached [Arteaga] and told him to leave." Arteaga acknowledged that the police had interviewed him several months after the shooting. *Id.*

For purposes of the hearing, the parties stipulated that a Chicago police detective questioned Arteaga about the shooting and about Garcia's whereabouts at the time of the shooting. *Id.* at *9. Arteaga told the detective that he did not learn of the shooting immediately after it occurred. When initially shown a photo array, Arteaga said he did not recognize anyone, but he later identified Covarrubias and Chapman when shown the photo array a second time. After speaking with an attorney, Arteaga told the detective that two Latin Counts members had come to the Pit on the night of the shooting, "bragging that they just burned a Satan Disciple

around 18th Street." When confronted about Garcia's involvement, Arteaga said he "could not recall" if Garcia was present at the Pit at the relevant time. *Id.*

**Coralia Martinico**: Coralia testified that she first met Garcia during a trip to Chicago in 2003 while attending a family reunion. She testified that on August 19, 2003, she and her husband Victor were at Garcia's house spending time with family. She estimated she and her husband did not leave the house until around midnight. According to Coralia, she recalled that Garcia and his brothers began playing video games in the dining room before Coralia fell asleep at around 10:00 p.m. When Coralia and Victor left, all three brothers were in their bedroom. Coralia testified that Mitchell never contacted her about the case. On cross-examination, Coralia was confronted with an affidavit she signed in support of Garcia's postconviction petition, where she "averred that she and Victor left [Garcia's] house at 11:30 p.m." *Id.* at *6.

**Fabian Garcia**: Fabian testified that he was 13 years old in 2003. On August 19, 2003, he was at his mother's house with Garcia and Nicholas, with whom he shared a bedroom. Fabian estimated that Victor and Coralia left at around 10:30 or 11:00 p.m. Fabian recalled playing video games with his brothers until approximately 11 p.m. or midnight, and he testified that Garcia never left the house that night. According to Fabian, Mitchell never spoke to him about testifying at the trial. *Id.*

**Nicholas Garcia**: Nicholas testified that he was 13 years old in 2003. He recalled taking a trip to the mall with his mother on August 19, 2003, and when he returned home, several family members were there to visit Victor and Coralia. Sometime later, Victor and Coralia left, after which Nicholas and his brothers played

video games in their shared bedroom until Nicholas fell asleep around 10:00 p.m. Nicholas testified that Garcia did not leave the house that night and that he never spoke with Mitchell before the trial. *Id.* at *7.

**Diane Garcia**: At the hearing, Diane testified that she hired Mitchell as Garcia's lawyer following Garcia's arrest in 2004. Soon after, she provided Mitchell with a flyer she had recently found for a family reunion that occurred the weekend before the shooting. Diane told Mitchell that on August 19, 2003, she had been home with Victor, Coralia, Garcia, Nicholas, and Fabian. She recalled providing a copy of a bank statement to Mitchell to help prove that Victor had been in Chicago the week of the shooting. Diane testified that "Mitchell made one phone call to Victor," but to her knowledge, Mitchell did not interview Coralia, Fabian, or Nicholas. *Id.* at *6.

**Garcia**: Garcia testified that his mother hired Mitchell to represent him shortly after his arrest in 2004. Garcia gave Mitchell his potential alibi witnesses, including Victor, Coralia, Diane, and his brothers Fabian and Nicholas, whom Mitchell said would be called at trial. Garcia testified that he did not meet with Mitchell very often leading up to the trial and that Mitchell only came to the prison once the week before trial. According to Garcia, Mitchell said calling the alibi witnesses was unnecessary because the State's case was weak. Garcia testified that, to his knowledge, Mitchell never interviewed Fabian, Nicholas, or Coralia. *Id.* at *7.

**Mitchell**: Mitchell testified that after he was retained to represent Garcia, he met with Diane on several occasions to discuss the case, including one in-person meeting at a restaurant where Arteaga was present. Mitchell testified that his initial

impression was that Arteaga would be a useful witness because he recalled that Chapman, Covarrubias, and a third person—who was not Garcia—had left the apartment together in a vehicle. *Id.* As the trial approached, however, Mitchell became concerned that Arteaga "'sort of flipped on me' and indicated that he was going to provide harmful testimony that would implicate" Garcia, so Mitchell decided not to call him. *Id.* at *8.

According to Mitchell, he also spoke with Garcia's grandfather Victor "at least two or three times" both in person and over the phone, but eventually became "concerned" that Victor was either lying or had memory issues that might impact the believability of Diane's testimony. Mitchell testified that Victor's testimony would not have added to Diane's because neither had seen Garcia at the time of the shooting. Mitchell explained that he ultimately chose to call Diane and not Victor because Diane was the more credible witness. Mitchell testified that he did not recall receiving any bank statement from Victor, though the parties stipulated that a copy of the bank statement was in Mitchell's file. *Id.* at *7.

Regarding Coralia, Mitchell testified that he recalled speaking with her on the phone, but he did not recall the substance of that conversation. *Id.* Mitchell testified that he did not call Coralia as a witness because she had not interacted with Garcia at the time of the shooting, and Mitchell did not think she would add to Diane's testimony. *Id.* at *8.

Mitchell testified that he spoke with Diane about Garcia's brothers, Fabian and Nicholas. According to Mitchell, Diane advised that "it may not be ideal" to

involve Nicholas. Mitchell testified that he spoke with Garcia directly about calling the brothers, and Garcia ultimately agreed that Nicholas should not testify. Mitchell could not recall why Fabian was not called at trial, but he "probably" did not believe Fabian's testimony would add to Diane's. Mitchell believed that "someone definitely would have spoken with Fabian," but he could not recall whether Mitchell personally or another attorney working with him had done so. *Id.*

Mitchell explained that, in his experience, "there is a danger associated with 'compounding' the testimony of an 'excellent witness' because if a witness deviates from your 'main witness' it could damage the credibility of the entire defense." He also explained that he considered the fact that all the potential alibi witnesses were Garcia's family members, "which provided the State an opportunity to attack their credibility," particularly when none had seen Garcia at the time of the shooting. *Id.*

### 2. Hearing Outcome

After the conclusion of the hearing, the trial court denied relief. *Id.* at *9. It found that it was "clear that all of defendant's additional witnesses had inconsistent recollections of the time and events on the night of the shooting. If they were called as witnesses, it is evident that there would have been problems with their alibi defense testimony." *Id.* (cleaned up). The court found that Arteaga's testimony was not credible, in part because he had been impeached by his statements to the police when questioned prior to trial. The court concluded that Mitchell's representation was not objectively unreasonable under *Strickland* because "the evidence established that counsel either interviewed or investigated the potential alibi witnesses. The decision not to call them was a matter of trial strategy." *Id.* (cleaned up). The court

concluded that presenting "all of those alibi witnesses and all their family members," would have raised "the possibility of cumulative evidence," the "issue of potential bias," and "inconsistencies as far as times and where people were sleeping in the house," all of which would have negatively affected the defense's case. *Id.* at *10. The state appellate court affirmed. *Id.* at *13.

Thereafter, Garcia filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, raising claims of ineffective assistance of counsel, based on Mitchell's failure to investigate or call certain witnesses at trial and denial of due process based on statements made during the closing arguments at trial. [Dkt. 8 at 7, 28.]

## II. Legal Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, a petitioner in custody pursuant to the judgment of a state court must make two showings to be eligible for a writ of habeas corpus: (1) "that he is in custody in violation of the Constitution or laws or treaties of the United States," § 2254(a), and (2) that the state postconviction court's adjudication of his claim "resulted in a decision that" either "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(1)–(2).[3]

---

[3]     Even if the petitioner satisfies the § 2254 prerequisites, the writ will no issue unless he persuades the Court that "law and justice require" habeas relief. *Brown v. Davenport*, 142 S. Ct. 1510, 1524 (2022) (quoting 28 U.S.C. § 2243). The Court does not reach this issue because, as explained below, Garcia has not satisfied the § 2254 prerequisites.

The requirements of § 2254 are difficult to clear. As the Supreme Court "has stated unequivocally, and on more than one occasion, … 'clearly established law as determined by [the Supreme] Court refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Berkman v. Vanihel*, 33 F.4th 937, 945 (7th Cir. 2022) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 660–61 (2004)). The "contrary to" prong does not apply unless "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases … [or] confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different." *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). And a state court decision is not an "unreasonable application" of clearly established federal law unless it is "objectively unreasonable," "lying well outside the boundaries of permissible differences in opinion." *Felton v. Bartow*, 926 F.3d 451, 464 (7th Cir. 2019) (cleaned up). The decision must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

### III. Ineffective Assistance of Trial Counsel

Garcia contends that his conviction violated his Sixth Amendment right to the effective assistance of counsel because Mitchell failed to investigate or call certain witnesses at trial. [Dkt. 8 at 7–28]. He maintains that testimony from Arteaga, Victor, Coralia, Fabian, and Nicholas would have assisted with his alibi defense, and that Mitchell's decision not to call them was not strategic. *Id.*

12

### A. *Strickland* Standard

To prevail on a claim for ineffective of counsel under *Strickland v. Washington*, Garcia must demonstrate (1) "that counsel's performance was deficient" and (2) "that the deficient performance prejudiced the defense." 466 U.S. at 687. The first prong requires a showing "that counsel's representation fell below an objective standard of reasonableness," or "outside the wide range of professionally competent assistance," judged "under prevailing professional norms." *Id.* at 688, 690. A court deciding an ineffective assistance claim "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690. Additionally, to help eliminate "the distorting effects of hindsight," the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Once a petitioner has established that counsel's performance was deficient, he must then demonstrate that counsel's deficient performance prejudiced his defense. To do so, a petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

"A lawyer's decision to call or not call a witness is a strategic decision generally not subject to review," and counsel need not present each and every possible witness. *Carter v. Duncan*, 819 F.3d 931, 942 (7th Cir. 2016) (cleaned up). "If counsel has investigated witnesses and consciously decided not to call them, the decision is probably strategic. An outright failure to investigate witnesses, however, is more

likely to be a sign of deficient performance." *Id.* (cleaned up). The question, then, is whether a strategic decision was made, because "the consequences of inattention rather than reasoned strategic decisions are not entitled to the presumption of reasonableness." *Id.* (cleaned up).

### B. Application

For AEDPA deference purposes, the Court looks to the state appellate court's decision on post-conviction appeal, *Garcia II*, as it was the "last reasoned state-court decision" addressing the merits of this claim. *Dassey v. Dittmann*, 877 F.3d 297, 302 (7th Cir. 2017) (en banc) (quoting *Johnson v. Williams*, 568 U.S. 289, 297 n.1 (2013)). That decision neither was contrary to nor involved an unreasonable application of the Supreme Court's caselaw, so the Court must deny relief. 28 U.S.C. § 2254(d),

Beginning with the "contrary to" prong, the state appellate court correctly identified *Strickland* as the governing standard for the ineffective assistance claim. *See Garcia II*, 2021 WL 2290801, at *10 (citing *Strickland*'s two-pronged standard). Specifically, the court acknowledged that decisions concerning which witnesses to call are generally a matter of trial strategy, but it noted that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary" and that "strategic choices made by counsel after having made a thorough investigation are 'virtually unchallengeable.'" *Id.* at *11 (cleaned up). Thus, the decision was not contrary to clearly established federal law. *See* 28 U.S.C. § 2254(d)(1); *Wilber v. Hepp*, 16 F.4th 1232, 1249 (7th Cir. 2021).

Turning to the "unreasonable application" prong, the state appellate court concluded that Mitchell's decision not to call certain witnesses was a matter of trial

strategy, and therefore counsel's performance was not deficient. *Garcia II*, 2021 WL 2290801, at *12–13. The court rejected Garcia's argument that Mitchell performed deficiently, agreeing with the trial court's conclusion that Mitchell conducted a sufficient investigation into each witness and decided not to call them as a matter of trial strategy. *Id.*

The state appellate court observed that Mitchell had presented an alibi defense through Diane's trial testimony. It credited the trial court's assessment of Mitchell's reasons for calling only Diane as an alibi witness, including that (1) Diane was "an excellent witness who testified credibly," and presenting duplicative alibi witnesses "who did not add to her testimony might invite" unwanted juror scrutiny; (2) none of the proposed alibi witnesses, including Diane, had seen Garcia at the time of shooting; and (3) all of the alibi witnesses were family members, leaving them vulnerable on cross-examination. *Id.* at *11. The court also credited the trial court's conclusion that Mitchell or others working on his behalf "spoke with all of the proposed witnesses, save for Nicholas." *Id.* Although the record was not clear as to whether Mitchell or someone working at his direction spoke with Nicholas, Mitchell's testimony established that "he spoke with Diane and the defendant about whether to include Nicholas in the defense prior to determining not to call him as a witness." *Id.*

The state appellate court also rejected Garcia's arguments about the decision not to call specific witnesses. The court explained that Arteaga's testimony "would not be as beneficial as [Mitchell] once believed," in part because Arteaga could have been impeached by a stipulation that Arteaga had not told the detective who

15

interviewed him that Garcia was not at the apartment on the night in question. *Id.*
at *12. The court noted that the failure to call Victor was not erroneous given
Mitchell's testimony that Victor "had difficulty answering easy questions." *Id.* The
court also agreed that the hearing had revealed discrepancies between certain
witnesses that could have been harmful at trial. *Id.* For example, Nicholas, Diane,
and Fabian gave inconsistent testimony about the apartment layout and where each
family member slept. Coralia, Nicholas, and Fabian "disagreed about when Victor
and Coralia left and when the boys went to sleep." *Id.* The court also credited the trial
court's conclusion that Mitchell viewed the cumulative effect of calling the potential
witnesses a "dangerous" strategy "because the jury could scrutinize minor
discrepancies in the testimonies." *Id.* at *13. Based on all of this, the state appellate
court concluded that the trial court did not commit error when it concluded that the
proposed testimony would have been harmful to the defense, and it affirmed without
addressing *Strickland*'s prejudice prong. *Id.*

Garcia has not attempted to rebut the state courts' findings of fact, *see* 28
U.S.C. § 2254(e)(1), and based on those findings, the state appellate court determined
that Mitchell acted strategically in choosing not to conduct further investigation and
not to call more alibi witnesses. Since his choices were a matter of trial strategy, the
court determined that Mitchell did not perform deficiently. Far from being "so lacking
in justification that there was an error well understood and comprehended in existing
law beyond any possibility for fairminded disagreement," *Harrington*, 562 U.S. at
103, the state appellate court's opinion thoroughly engaged with the *Strickland*

16

standard, and its decision fell comfortably within "the boundaries of permissible differences of opinion," *Corcoran v. Neal*, 783 F.3d 676, 683 (7th Cir. 2015) (internal quotation omitted).[4] Thus, the state appellate court's decision did not involve an unreasonable application of federal law.[5] The Court denies Garcia relief on his ineffective assistance of counsel claim.

## IV.    Improper Closing Arguments

Garcia's second claim is that the prosecutor delivered improper closing arguments by making statements that "turned the trial into a referendum on gang violence, denigrated [the] presumption of innocence," and "insinuated that defense counsel had fabricated a defense." [Dkt. 8 at 28.] Respondent argues that the Court should not review this claim because it was procedurally defaulted. [Dkt. 18 at 7–8.]

### A.    Procedural Default: Independent and Adequate State Grounds

Federal courts may not review state prisoners' habeas claims that have been "procedurally defaulted in state court," a doctrine that advances "comity, finality, and federalism interests." *Davila v. Davis*, 582 U.S. 521, 527–28 (2017). Procedural default occurs when a state court judgment rests upon adequate and independent state grounds. *Id.* at 527; *Flint v. Carr*, 10 F.4th 786, 793 (7th Cir. 2021); *Thomas v. Williams*, 822 F.3d 378, 384 (7th Cir. 2016). A ground is adequate if it is "firmly

---

[4]    Garcia's reliance on *Towers v. Brannon*, 2022 WL 4094138 at *12–14 (N.D. Ill. Sept. 7, 2022), is unpersuasive. In *Towers*, trial counsel made no attempt to contact three potential witnesses who could have been called at trial. Conversely, in this case, at the 2018 hearing, the state appellate court agreed with the trial court's conclusion that Mitchell or others working on his behalf spoke with each of the proposed witnesses except for Nicholas, and it was reasonable not to call Nicholas as a witness for the reasons discussed above.

[5]    Garcia has failed to establish deficient performance, so it is unnecessary to address prejudice. *See Gage v. Richardson*, 978 F.3d 522, 527 (7th Cir. 2020).

established and regularly followed." *Flint*, 10 F.4th at 793 (quoting *Beard v. Kindler*, 558 U.S. 53, 60 (2009)). A ground is independent "if it does not depend on the merits of the petitioner's claim." *Id.* (internal quotation omitted). When a state court refuses to adjudicate a petitioner's federal claims because he did not raise them in accordance with the state's procedural rules, "that will normally qualify as an independent and adequate state ground for denying federal review." *Id.* at 794 (internal quotation omitted). Forfeiture (or waiver) is "almost always such a ground." *Id.*; *see also Kaczmarek v. Rednour*, 627 F.3d 586, 592 (7th Cir. 2010).

Here, Garcia has procedurally defaulted his claim about the prosecutor's closing argument because the state appellate court denied it on adequate and independent state forfeiture grounds. On direct appeal, Garcia argued, as he does here, that several of the prosecutor's comments "amounted to a referendum against gang violence, distracted the jury from its charge to determine his guilt or innocence, and were made solely to arouse the passion and prejudice of the jury." *Garcia I*, slip op. at 17. The state appellate court rejected this argument, noting that Garcia did not object to the arguments at trial and that the failure to properly preserve the prosecutorial misconduct argument raised for the first time on direct appeal meant that the claim was forfeited. *Id.*, slip op. at 14. Accordingly, the state appellate court actually relied on the procedural bar—forfeiture—as an independent basis for its disposition of Garcia's argument. *See Kaczmarek*, 627 F.3d at 592 (explaining that an appellate court's reliance on the contemporaneous objection requirement constitutes an adequate and independent state law ground).

18

It is true that the state appellate court nevertheless analyzed Garcia's arguments for plain error, finding that Garcia "failed to satisfy either prong of the plain-error doctrine." *Garcia I*, slip op. at 15–28. But the fact that the court engaged in plain error review does not cure the procedural default. Where a state court "reviews a federal constitutional claim for plain error because of a state procedural bar … that limited review does not constitute a decision on the merits." *Kaczmarek*, 527 F.3d at 592; *see also Gray v. Hardy*, 598 F.3d 324, 329 (7th Cir. 2010) ("[W]e have repeatedly explained that where a state court reviews the claim for plain error as the result of a state procedural bar such as the Illinois doctrine of waiver, that limited review does not constitute a decision on the merits." (citations omitted)). As a result, the state appellate court's plain error analysis does not alter the fact that Garcia procedurally defaulted this claim.

### B.    Excuse for Procedural Default

Since Garcia has procedurally defaulted his claim, the Court can excuse the procedural default and reach the merits only if he demonstrates either: (1) cause for the default and actual prejudice or (2) that failure to consider the claims will result in a fundamental miscarriage of justice. *Snow v. Pfister*, 880 F.3d 857, 864 (7th Cir. 2018). Garcia fails to make either showing, so the Court will not excuse his default.

### 1.    Cause and Prejudice

Cause requires Garcia to show "some type of external impediment" that prevented him from presenting his claims. *Garcia v. Cromwell*, 28 F.4th 764, 775 (7th Cir. 2022) (internal quotation omitted). In his reply brief, Garcia argues that there is cause to excuse his failure to contemporaneously object to the prosecutor's comments

based on the ineffectiveness of trial counsel. He urges the Court to find cause because he raised trial counsel's ineffectiveness "for failing to object and properly preserve his prosecutorial misconduct claim" on direct appeal. [Dkt. 21 at 4–5.] Attorney error can satisfy the cause requirement, but only if the error amounted to constitutionally ineffective assistance of counsel. *See Wrinkles v. Buss*, 537 F.3d 804, 812 (7th Cir. 2008) ("Attorney error rising to the level of ineffective assistance of counsel can constitute cause to set aside procedural default." (citation omitted)). But if the record shows that a particular underlying claim lacks merit, then counsel was not ineffective in failing to assert that claim. *See Johnson v. Thurmer*, 624 F.3d 786, 793 (7th Cir. 2010); *Fuller v. United States*, 398 F.3d 644, 650–52 (7th Cir. 2005).

Here, the record shows that Garcia's underlying claim lacks merit. On direct appeal, after concluding that the claim was forfeited, the state appellate court analyzed the prosecutor's comments during closing arguments, concluding that the challenged remarks did not constitute a serious error that affected the fairness of the trial. *Garcia I*, slip op. at 15. Regarding the gang references, the state appellate court found that "evidence pertaining to gang involvement and violence was integral to both the prosecution and the defense" such that "the prosecutor was entitled to comment on the nature and relevance of the gang evidence." *Id.*, slip op. at 20. It also noted that many of the prosecutor's comments were made in response to defense counsel's closing argument. *Id.* Likewise, the court rejected Garcia's argument that the prosecutor improperly described the burden of proof, minimized the presumption of innocence, or denigrated Garcia's theory of the case. *Id.*, slip op. at 24–28. The state

appellate court concluded that Garcia had not shown that the closing arguments constituted an error "so serious that it affected the fairness of his trial and challenged the integrity of the judicial process." *Id.*, slip op. at 28. As noted above, the Court has adopted the state courts' findings, *see* 28 U.S.C. § 2254(e)(1), which demonstrate that Garcia's underlying claim regarding closing argument lacks merit. Because this claim is without merit, trial counsel was not ineffective for failing to object to the prosecutor's statements[6] and Garcia cannot show cause to excuse the default.

### 2. Actual Innocence

Nor can Garcia show any fundamental miscarriage of justice that would excuse his procedural default of his claim. This excuse requires the petitioner to "prove that he is actually innocent of the crime of which he has been convicted." *McDowell v. Lemke*, 737 F.3d 476, 483 (7th Cir. 2013) (citation omitted). Tenable actual-innocence claims are rare: A petitioner "does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) (internal quotation omitted); *see also Wilson v. Cromwell*, 69 F.4th 410, 422 (7th Cir. 2023) ("[W]e must consider all the evidence, both old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted at trial." (internal quotation omitted)). The

---

[6]   The state appellate court also rejected Garcia's ineffective assistance of trial counsel claim based on trial counsel's failure to object during closing arguments. *Garcia I*, slip op. at 28. Applying *Strickland*, the state appellate court held that Garcia failed to establish that a reasonable probability existed that the outcome of his trial would have been different had defense counsel objected during closing arguments. *Id.*, slip op. at 29.

only evidence that might qualify as new is a 2019 affidavit from Edmondson—the victim of Garcia's attempted murder conviction—stating that Garcia was not the shooter, that he did not and does not know the shooter's identity, and that his trial testimony to the contrary was false. [Dkt. 8 at 42–44.] Even assuming that this affidavit should be considered when evaluating whether to excuse Garcia's procedural default,[7] it would not persuade the Court that no reasonable juror would find Garcia guilty beyond a reasonable doubt. *See McQuiggan*, 569 U.S. at 386.

The Seventh Circuit's recent decision in *Wilson v. Cromwell* is instructive. There, a state habeas petitioner sought to excuse procedural default by showing that he was actually innocent, and he offered the testimony of an eyewitness who identified the shooter not as the petitioner, but as another witness who testified for the prosecution. *See* 69 F.4th at 416–17, 421–22. The Seventh Circuit held that the petitioner had not satisfied his burden because, while the testimony was credible, it "just add[ed] a new voice to a highly complex, and often inculpatory, evidentiary record," with some witnesses "unequivocally identif[ying] [the defendant] as the gunman." *Id.* at 422–23. Further, the testimony was "presented more than four years later," further undermining its persuasiveness. *See id.* at 422. Nor did the fact that the new witness identified "the state's chief witness" as the shooter change the outcome. *See id.* at 425 (Hamilton, J., dissenting).

---

[7]     Garcia appears not to have attempted to meet his burden of establishing that the affidavit is "both new and credible," *see Wilson*, 69 F.4th at 421–22, but since Garcia is proceeding *pro se*, the Court construes his filings liberally, *Balle v. Kennedy*, 73 F.4th 545, 553 (7th Cir. 2023), and it will evaluate the effect of this evidence.

Here, the new evidence is much less impactful than in *Wilson*. Edmondson's affidavit merely recants his own trial testimony without identifying a different shooter or casting doubt on the other witnesses' identifications. Edmondson produced his affidavit in 2019, 13 years after Garcia's 2006 trial, which renders it even less persuasive than the *Wilson* testimony that came four years after trial. *See id.* at 422. Further, since the Court must consider the effect of the old and new testimony together, *id.*, the jury would have had before it both Edmondson's original testimony identifying Garcia and his recantation, and it would have to sort out whether he was lying in his original testimony or his new testimony. If the new evidence in *Wilson* did not satisfy the petitioner's burden, the Court is certain that Edmondson's affidavit alone is not "so compelling and unequivocal that no reasonable juror would have convicted [Garcia] in the light of it." *Id.*; *see also id.* at 423–25 (explaining that this "conclusion accords with relevant precedent"). Garcia has therefore failed to show an excuse for his procedural default based on actual innocence.

## V. Certificate of Appealability and Notice of Appeal Rights

This Court's denial of Garcia's petition is a final decision ending the case. Garcia may appeal only if he obtains a certificate of appealability from this Court or the Court of Appeals. 28 U.S.C. § 2253(c)(1)(A). The Court declines to issue a certificate of appealability because Garcia does not make a substantial showing of the denial of a constitutional right, *see* § 2253(c)(2), and reasonable jurists would not debate, much less disagree with, this Court's resolution of his claims. *See Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008). If Garcia wishes to appeal, he must request a certificate of appealability from the Court of Appeals pursuant to Federal

Rule of Appellate Procedure 22 and 28 U.S.C. § 2253(c), in addition to filing his notice of appeal.

Garcia must file a notice of appeal in this Court within 30 days after judgment is entered. Fed. R. App. P. 4(a)(1). He need not bring a motion to reconsider this decision to preserve his appellate right, but if he wishes the Court to reconsider its judgment, he may file a motion under Federal of Civil Procedure 59(e) or 60(b). A Rule 59(e) motion must be filed within 28 days of entry of judgment and suspends the deadline for filing an appeal until the motion is ruled on. *See* Fed. R. Civ. P. 59(e); Fed. R. App. P. 4(a)(4)(A)(iv). A Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). A Rule 60(b) motion suspends the deadline for filing an appeal until the motion is ruled on only if the motion is filed within 28 days of the judgment. Fed. R. App. P. 4(a)(4)(A)(vi). The time to file a Rule 59(e) or 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2).

## IV. Conclusion

For the foregoing reasons, the petition for a writ of habeas corpus [Dkt. 1, 8] is denied. The Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c). Final judgment shall enter in favor of Respondent Dart and against Petitioner Garcia. Civil case terminated.

Enter: 22-cv-1958
Date: October 6, 2023

_____

Lindsay C. Jenkins
United States District Judge